## THE PERSIAN MONARCH.

### BRIODY v. THE PERSIAN MONARCH.

*(District Court, E. D. New York. February 25, 1892.)*

**SHIPPING—NEGLIGENCE—PERSONAL INJURIES—INSUFFICIENT MACHINE—NOTICE.**
  The fall-rope of a derrick, rigged upon a boom running in line with the keel, to the mizzen-mast of the steam-ship Persian Monarch, to aid in loading and discharging cargo, was carried outside of the ship to a loaded scow, for the purpose of hauling her along-side by a steam winch. Under the strain, one of the guy-ropes parted, and the boom swung around, injuring libelant, who was a longshoreman engaged in attending to the fall-rope. Such a derrick is not usually designed for, or sufficient to withstand, such lateral strains. But upon evidence that this derrick had been many times so employed on this ship, with the knowledge of her officers; that no other mode of removing such barges was practiced by the ship; and that the boom was supplied and rigged with strong vangs, for the purpose apparently of hauling barges along-side,—*held,* that the ship was liable for the libelant's damages, which, under the circumstances of his case, were assessed at $2,000.

In Admiralty. Suit to recover for personal injuries. Decree for $2,-000.

*E. H. Mars* and *William Allen,* for libelant.
*Foster & Thomson,* for claimant.

BROWN, District Judge. On the 11th of December, 1890, the libelant was employed as a longshoreman in loading and discharging the steamship Persian Monarch in this port. A derrick was rigged upon the mizzen-mast, the boom of which was held up some 12 feet above the deck by a chain running from the end of it to the mast aloft, and kept in position over the keel by a guy or vang of wire rope running from the end of the boom on each side to a block fastened to the deck near the rail. The libelant's duty was to tend the fall-rope. For the purpose of hauling along-side the ship a scow loaded with a cargo of flour, the hook of the fall-rope was carried outside of the ship on the starboard side and fastened upon the further side of the scow. The winch was then set in motion; but the scow being heavy, and the ebb-tide beneath the pier offering additional resistance, the strain became so great upon the guy on the port side, that it parted. Thereupon the boom swung suddenly to starboard, carrying the starboard guy and tackle along with it, and caught the libelant, who was standing by the starboard rail, and pressed him severely against the rail, causing him great injuries, for which the above libel was filed.

Several witnesses on behalf of the claimant testify, and I have no doubt that such is the fact, that a derrick rigged upon the mast is not designed for such lateral strains, or to be used in hauling barges by a longitudinal strain; and that the proper way to use the winch for that purpose is to detach the fall-rope from the block of the boom, or else to use a different hawser, and carry it through the chock on the side of the ship to the barge outside. The stevedore also testifies that the use of the fall from the boom was improper, and was only used when the offi-

cer of the ship was supposed not to be on the watch. On the other hand, considerable testimony for the libelant shows that the derrick on the Persian Monarch had been for several years employed a great many times in a similar manner, and whenever the ship was in port, with the knowledge and under the observation of the ship's officers, as well as under the direction of Mr. Phillips, superintendent of the line. None of the officers of the ship, nor Mr. Phillips have been examined to dispute these statements; and the fact that no other mode of hauling alongside is proved to have been practiced on the Persian Monarch, and that a wire rope calculated to stand the strain of some 8,000 pounds was used as a guy, a strength far beyond that required for merely holding the boom in place for any perpendicular work of the fall, is claimed to be evidence that the derrick was intentionally supplied and rigged for the purpose of convenience and quick dispatch in hauling barges alongside, as well as for its ordinary perpendicular work in loading and unloading cargo.

Taking all the circumstances into account, I am of the opinion that the libelant's theory is most compatible with the evidence, and with the reasonable presumptions of the case; that the purpose for which the derrick was supplied was much extended beyond its original design, and included, by the long and well-known practice of the ship, the hauling in of barges that might need small changes in position for the quick dispatch of the ship's business; and that the guys should, therefore, have been sufficient for hauling in such barges as came there in the ordinary course of business. This must include also hauling at the usual different stages of the tide, and under all other ordinary circumstances, unless some notice in the way of exception was given. None such was given.

Had the break arisen from a manifest gross misuse of the machine, as in attempting to raise ten tons where it was known to be designed only for one ton, or for five, I think such a palpable misuse would be negligence of fellow-workmen which would cast no responsibility upon the owners. But since the hauling of barges must, as the evidence stands, be included among the purposes for which this derrick was supplied, I cannot say that this barge and the circumstances of the attempt to moor it along-side, were so peculiar or extraordinary as to distinguish this case from that of other barges often moored in a similar manner.

There is great difficulty and uncertainty in determining what amount can be properly given as damages. The libelant is now, as is conceded, wholly disabled from severe work, through the enlargement and dangerous condition of the heart. He can only do light work, earning about one-third his former average wages. He is 42 years old. He testifies that before this accident he was strong and rugged, and never sick. I am satisfied that the other supposed troubles do not exist to any material degree. His ribs were not broken as supposed. His own physician believes the condition of his heart to have been produced by this accident. Dr. Flint, on the contrary, an expert of wide experience and high reputation, though admitting that to be barely possible, conceives

it to be in the highest degree improbable, and not at all credible. He thinks the libelant's condition originated in prior disorder of the heart, which might have come from any one of various causes and have been gradually developing. His own physician did not see the libelant until nine days after the accident, when, as he testifies, he found the condition of the libelant's heart for the most part as at present. During those nine days the libelant had been under treatment at the New York Hospital. The surgeons who examined and treated him there were not called as witnesses. Opportunity was given after the trial to either side to examine the surgeon in charge of the patient there, and to prove the record of his case, which is kept at the hospital, and which was produced in court by the defendant, but necessarily excluded under the libelant's objection. Neither side have availed themselves of the privilege of subsequent examination, although the libelant has introduced since the hearing additional evidence on other branches of the case. The burden of proof is upon the libelant to show what is the amount of the injury that he has sustained by the accident. In the difference between the physicians, evidence of the earliest examinations and of the record of his case is presumptively of great importance; and its non-production, when so easily procurable, necessarily leaves the libelant subject to the legal intendments against him from failing to produce important evidence in his power. As this evidence was equally available to the defendant, however, it is not to be taken as equivalent to concealment, or as disproving the libelant's case.

Under such circumstances I must regard the libelant's contention that his present condition has been wholly produced by this accident, as not sufficiently made out, but consider the case as one of previous heart disorder aggravated and accelerated in its development by this accident. Upon such a finding of the facts, there is no satisfactory standard for ascertaining the damages to be awarded. I can only do as a jury would, under similar circumstances, be obliged to do, viz., give such damages as on the whole commends itself to their judgment. I award the libelant $2,000, and costs.